UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| SUSAN BOCOCK, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:14-cv-00050 |
| | ) | |
| SPECIALIZED YOUTH SERVICES OF | ) | |
| VIRGINIA, INC., d/b/a Shenandoah | ) | **REPORT AND RECOMMENDATION** |
| Academy, a Virginia Corporation, | ) | |
| | ) | |
| and | ) | By:    Joel C. Hoppe |
| | ) | United States Magistrate Judge |
| TARIE SHULL, | ) | |
| Defendants. | ) | |

Before the Court is Defendants Specialized Youth Services of Virginia, Inc. ("SYS") and

Tarie Shull's Motion for Summary Judgment. ECF No. 35. Plaintiff Susan Bocock filed a

response in opposition to the motion, ECF No. 40, Defendants filed a reply brief, ECF No. 42,

and Bocock filed a surreply, ECF No. 46. Oral argument was heard on September 22, 2015, and

the matter is ripe for decision.

The motion is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 9. Having

considered the parties' pleadings, briefs, and oral arguments and the applicable law, I find that a

genuine issue of material fact exists as to whether Bocock was terminated in violation of the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112. I therefore recommend that the

presiding District Judge deny the Defendants' motion for summary judgment.

I. Procedural History and Preliminary Motions

On August 29, 2014, Bocock filed a Complaint in Rockingham County Circuit Court

containing two counts against Defendant SYS that alleged violations of the ADA and one count

against both Defendants that alleged wrongful discharge in violation of Virginia public policy

1

against both Defendants. Compl. ¶¶ 42–53, 54–60, 61–71, ECF No. 1-1. The Defendants

removed the case to federal court on October 1, 2014. ECF No. 1. On November 15, 2014,

Bocock voluntarily dismissed Count Two of the Complaint. ECF No. 18. The Defendants filed a

motion for summary judgment on Counts One and Three of the Complaint on August 26, 2015,

and Bocock filed her brief in opposition on September 15, 2015. Bocock also filed a motion to

voluntarily dismiss Count Three of the Complaint on September 21, 2015, ECF No. 41. The

Court recommended granting her motion in a separate report and recommendation, ECF No. 55,

and therefore this report and recommendation addresses only the claim in Count One of wrongful

termination in violation of the ADA and the evidentiary motions related to summary judgment.

As Bocock brought Count One against SYS but not Shull, the Court considers SYS the sole

Defendant for this motion.

At oral argument, both parties objected to the use of certain declarations and other

evidence by their opponents, and the Court granted leave for briefing on those issues. Bocock

thereafter filed a motion to strike the new matter contained in SYS's reply brief, including the

declaration of Stephen Jurentkuff. ECF No. 44. SYS responded to Bocock's motion, ECF No.

49, and Bocock filed a reply to their response, ECF No. 50. SYS in turn filed a motion to strike

the declaration of Tabatha Lessley, ECF No. 48, to which Bocock responded, ECF No. 51. As

outlined below, I find no prejudice to either party from the Court's consideration of the contested

evidence, and I therefore deny both motions to strike.

In support of the motion for summary judgment, SYS included an affidavit from Shull,

ECF No. 36-1, excerpts from Bocock's deposition, ECF No. 36-10, and multiple related exhibits.

Bocock's brief in opposition included excerpts from the depositions of Bocock, ECF Nos. 40-2

to 40-3, Shull, ECF Nos. 40-4 to 40-5, Warren Bull, ECF No. 40-7, and Christa Sutton, ECF No.

40-9; declarations from Bocock, ECF No. 40-10, Tabatha Lessley, ECF No. 40-11, Ryan Farrell, ECF No. 40-12, Gene Yoder, M.D., ECF No. 40-13, and Shirley Crawford, ECF No. 40-14; and other related exhibits. SYS's reply brief included excerpts from the depositions of Bull, ECF No. 42-1, Shull, ECF No. 42-2, Bocock, ECF No. 42-3, and Sutton, ECF No. 42-4, and an affidavit from Stephen Jurentkuff, ECF No. 42-5, none of which were included in its opening brief.

SYS objects to Lessley's declaration by arguing that Bocock failed to provide or timely amend Lessley's contact information and the description of her discoverable knowledge as required by Federal Rule of Civil Procedure 26. SYS Mot. to Strike Lessley Decl. 1–6. Bocock states that she provided updated contact information as she discovered it and argues that her initial description of Lessley's knowledge is sufficient under the Rules. Bocock Br. Opp'n Mot. to Strike Lessley Decl. 2–5.

In her motion, Bocock objects to SYS's use of evidence in its reply that it did not include in its first brief in support of summary judgment, arguing that introducing new arguments and evidence in a reply brief violates federal precedent and the local rules. Bocock Br. Supp. Mot. to Strike New Matter 1–3. She also contends that Jurentkuff's declaration is not made from personal knowledge and contains inadmissible hearsay. *Id.* at 3–6. SYS responds that it raises no new legal issues in its reply brief, SYS Br. Opp'n Mot. to Strike New Matter at 4–5, and the new factual evidence and deposition transcripts that it does include are provided to reply to exhibits presented with Bocock's brief in opposition to summary judgment and were not obtained until after SYS filed its motion for summary judgment, *id.* at 5–7. SYS also contends that Jurentkuff's declaration is neither faulty nor inadmissible. *Id.* at 7–9.

The timing of discovery in this case foreshadows the issues raised in these motions. Bocock relates that:

> For various reasons, including the schedules of Plaintiff's and Defendants'
> counsel, as well as the schedules of Defendants' main witnesses Shull and Bull,
> the depositions in this case were postponed until the end of the discovery period
> with the understanding among counsel that depositions that had been requested
> would be conducted after the formal discovery cut-off in order to accommodate
> schedules.

Bocock Br. Opp'n Mot. to Strike Lessley Decl. 3; *accord* SYS Br. Opp'n Mot. to Strike New Matter 1 ("From mid-July through early August, Plaintiff's counsel and defense counsel discussed and mutually agreed to an extension of the discovery deadline in this matter."). For example, the parties deposed President of SYS Warren Bull on August 25, 2015, the day before dispositive motions were due. Bocock Br. Opp'n Mot. to Strike Lessley Decl. 3. Though Sutton's deposition was taken on August 6, 2015, and Shull's deposition was taken on August 7, 2015, SYS did not receive a copy of Sutton, Shull, or Bull's depositions until September 8, 2015. SYS Br. Opp'n Mot. to Strike New Matter 1–2. The day after summary judgment was due, SYS's counsel sent an email requesting further contact information for five of Bocock's witnesses so that he could schedule depositions. Bocock Br. Opp'n Mot. to Strike Lessley Decl. Ex. 5. Neither party blames the other for the delays; they have apparently "worked collaboratively," *id.* at 3, to resolve scheduling issues and complete discovery despite the formal end of the discovery period.

Turning first to the Lessley declaration, the Court does not find a violation of Rule 26 or Rule 37(c)(1). To determine whether using undisclosed evidence is harmless under Rule 37(c)(1), courts evaluate "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

4

Bocock listed Lessley in her initial disclosures with no known address, claiming that "[s]he has knowledge of her own health issues and Tarie Shull's disclosure of those issues in front of others, and demeaning conduct based upon health conditions." Pl. Initial Disclosures, ECF No. 51-1. Lessley's declaration submitted with Bocock's brief in opposition to summary judgment contains that information and also describes interactions between Lessley and Shull and Lessley and Shaun Waters, her supervisor at SYS, concerning Bocock and her termination, including a statement by Shull that Bocock's PTSD affected her performance with students. *See* Lessley Decl., ECF No. 40-11. While all this information may fit under the broad category of "demeaning conduct based upon health conditions," the description given in Bocock's initial disclosures does imply that Lessley had information about demeaning conduct directed at herself, rather than at Bocock. Bocock's counsel attempted to contact Lessley throughout the discovery period, but was unable to do so until he located a new telephone number for her on September 9, 2015. Bocock Br. Opp'n Mot. to Strike Lessley Decl. 4–5. He provided the new number to SYS the same day and took Lessley's declaration the next. *Id.* at 5. SYS learned the full contents of Lessley's declaration when it was attached to Bocock's opposition to summary judgment five days later.

Even if Bocock did fail to properly disclose Lessley's knowledge, the failure was harmless. There is no disruption to the trial like that in *Southern States*, when the nondisclosure of an expert opinion was revealed two days into the trial. 318 F.3d at 594. The declaration is relatively important to Bocock's efforts to demonstrate SYS's knowledge of her disability and its motivation in her termination. Also, with discovery stretching beyond its deadline to coincide with the summary judgment briefing schedule, Bocock's counsel was understandably preoccupied with finding, analyzing, and organizing evidence for her brief in opposition. Most

5

importantly, SYS has had ample opportunity to cure whatever surprise it experienced from Lessley's declaration. SYS was able to respond with its reply brief and accompanying exhibits and argue summary judgment before this Court with all three briefs in the record.

SYS argues that it is prejudiced because it did not have an opportunity to cross-examine Lessley and states it would have deposed her had it known the contents of her declaration sooner. SYS Mot. to Strike Lessley Decl. 5–6. The earliest SYS could have learned more about Lessley's knowledge was only five days before it ultimately received her declaration, and SYS has not attempted to depose Lessley since. Bocock Br. Opp'n Mot. to Strike Lessley Decl. 7. Furthermore, Bocock's counsel states that he will make himself available for a deposition of Lessley if requested. *Id*. "[T]he basic purpose of Rule 37(c)(1)" is "preventing surprise and prejudice to the opposing party." *S. States*, 318 F.3d at 596. Here, there is little surprise and less prejudice. That SYS did not have a slightly more detailed description of Lessley's account five days sooner had no practical impact upon its ability to argue its case for summary judgment.

Furthermore, SYS also identified Lessley as a potential witness. SYS has not argued that Bocock intentionally delayed obtaining evidence from Lessley, and the record does not suggest a lack of diligence on Bocock's part. Indeed, it seems that neither party had reliable contact information for Lessley until September 9. Considering this context, I find that the delay was not unreasonable or prejudicial.

Considering Bocock's motion to strike the new matter included with SYS's reply brief in support of summary judgment, the Court finds a similar lack of prejudice. A defendant may submit additional evidence and declarations with a reply brief to address issues and facts raised in a plaintiff's opposition to summary judgment. *See, e.g.*, *Ilozor v. Hampton Univ.*, No. 4:06cv90, 2007 WL 1310179, at *14 (E.D. Va. May 3, 2007) *aff'd*, 286 F. App'x 834 (4th Cir.

6

2008) (rejecting the same argument made by Bocock here—that new declarations filed with a reply brief were impermissible new evidence—because the evidence addressed issues raised by the plaintiff's opposition brief); *Baugh v. City of Milwaukee*, 823 F. Supp. 1452, 1456–57 (E.D. Wis. 1993) (finding no cause to strike new evidence "where the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment"); *cf. Kershner v. Norton*, Civ. A. No. 02-1887, 2003 WL 21960605, at *2 (D.D.C. Aug. 14, 2003) ("[F]iling an affidavit with a reply is appropriate when the affidavit addresses matters raised in the opposition. Such an approach fulfills the purpose of Rule 6(d), which is to avoid unfair surprise and permit the court to resolve motions on the merits." (citations omitted)).

Because of the delay in completion of discovery, SYS filed its motion for summary judgment without the transcripts from multiple depositions, including those of Shull, Sutton, and Bull, which SYS first received on September 8, 2015. SYS Br. Opp'n Mot. to Strike New Matter 1–2. Bocock had these and other depositions when she prepared her brief in opposition and used them and multiple declarations to support her argument. It is understandable and fundamentally fair that SYS would reply to Bocock's brief using the same evidentiary arsenal as Bocock used, rather than remaining limited to the incomplete discovery it possessed when first filing its motion. Importantly, the Court granted Bocock leave to file a surreply to address the evidence submitted with SYS's reply brief.

Bocock contends that SYS's reply brief impermissibly raises a new legal issue by arguing that, regardless of whether Shull had discriminatory motives, Jurentkuff did not and it was he who made the final decision. The Court does not see a new legal theory raised in the pleadings. In its first brief, SYS stated that Jurentkuff terminated Bocock as a "result of her insubordinate

behavior to the Executive Director of SYS, the Principal of Shenandoah Academy, and her supervisor, her intimidation of her co-workers, and her improper and angry behavior around students." SYS Br. in Supp. 10. SYS supported this argument with Shull's affidavit, supervision paperwork from the alleged incidents, and termination paperwork completed by Jurentkuff. In its reply brief, SYS relates the same reasons for Bocock's termination and adds Jurentkuff's declaration and excerpts from additional depositions as evidence. *See* SYS Reply Br. 14–16. SYS has maintained throughout the case that Jurentkuff made the decision to terminate Bocock and he did so without any discriminatory motive. SYS provided additional evidence to support this theory in their reply brief in response to the matters put forward in Bocock's opposition brief; it did not make a new legal claim.

Bocock also argues that Jurentkuff's declaration is not made from personal knowledge and contains hearsay. The Federal Rules of Civil Procedure require affidavits and declarations to be made from personal knowledge, Fed. R. Civ. P. 56(c)(4), but they do not require a specific statement to that effect from the affiant or declarant, as Bocock suggests. Contrary to her arguments, it is not "impossible determine whether [Jurentkuff] is just reciting what is in documents, testifying to what someone told him, or doing a combination of the two." Bocock Br. Supp. Mot. to Strike New Matter 4. The Court finds this evident from context and rejects this objection to Jurentkuff's declaration.

Portions of Jurentkuff's declaration would be hearsay if they are offered for the truth of the matters asserted. In paragraph five, Jurentkuff states "There came a time in 2012 when I became aware of certain incidents and issues with Ms. Bocock." Jurentkuff Decl. ¶ 5. Paragraphs six to eight and eleven to twelve then relate events that SYS alleges occurred and which Bocock contests. The remainder of Jurentkuff's declaration details his own visit to Shenandoah

Academy, his decision to fire Bocock, and his lack of knowledge about her disability. The questionable paragraphs, however, are not put forward to prove that those incidents occurred; instead, they demonstrate Jurentkuff's subjective beliefs about Bocock's conduct and the impact they had upon his decision to terminate her. SYS uses other sources to argue that these events actually occurred; it does not attempt to offer these paragraphs from Jurentkuff's declaration for the truth of the matters asserted, and they are consequently not hearsay.

Finally, the Court notes that even with consideration of the additional evidence SYS submitted, it finds summary judgment unwarranted. Bocock's motion is thus functionally moot.

In conclusion, discovery in this case stretched beyond its prescribed deadline by mutual agreement, leading to a shifting evidentiary landscape during summary judgment briefing. Nonetheless, both sides have been able to respond formally after the dust settled and their opponents' arguments and evidence were clearly discernible. The parties made this bed together and they may not force their opponent to lie in it while they stay clear. The Court finds no prejudice under these facts and recommends both motions be denied.

## II. Facts

For the purposes of this motion, the court must accept the evidence of the non-movant and draw all justifiable inferences in her favor. *Tolan v. Cotton*, --- U.S. ---, 134 S. Ct. 1861, 1863 (2014) (per curiam) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Bocock is an army veteran, Bocock Dep. 13–14, with a history of severe depression and anxiety for which she has received treatment including hospitalization, counseling, and medication since at least 2008, Gene Yoder, M.D., Decl. ¶¶ 2–4. Bocock functions normally under her current medication regime, but when she does not take her medication, she does not want to be around people and must stay in her house. Bocock Dep. 74:6–16, 134:1–8. In May 2009, Bocock

9

suffered a criminal malicious wounding. *Id.* at 32–38. She received extensive injuries to her head and shoulder that required multiple surgeries and kept her from working for a year. *Id.* at 36–38; 46–48. Bocock was diagnosed with Post-Traumatic Stress Disorder ("PTSD") after the attack. *Id.* at 42:5–7.

SYS owns and operates special schools in Harrisonburg and Petersburg, Virginia, for children who are unable to attend standard schools because of emotional, behavioral, or other educational disabilities. Compl. ¶ 5; Answer ¶ 5, ECF No. 28. SYS employed more than fifty employees each year from 2010 to 2012. Compl. ¶ 5; Answer ¶ 5; Bull Dep. 7–8. At all relevant times, Tarie Shull was the principal at SYS's Harrisonburg facility, Shenandoah Academy. Compl. ¶¶ 4–5; Answer ¶¶ 4–5. Effective May 10, 2010, SYS hired Bocock as part-time one-on-one support staff at Shenandoah Academy for the remainder of the 2009–2010 school year. SYS Br. in Supp. Ex. 2. SYS rehired Bocock as a full-time support teacher for the 2010–2011 school year in August 2010, *id.* Ex. 3, then changed her to a full-time technical and support teacher in September 2010, *id.* Ex. 4, and gave her that same position for the 2011–2012 school year, *id.* Ex. 5.

As part of her application to SYS, Bocock completed an Employment Health Examination Record with the help of Dr. Yoder. Shull Dep. 49–51; Yoder Decl. ¶ 8; *id.* Ex. 4. She indicated that she experienced head injuries, sinus trouble, fracture, operations, and other injuries, but had no medical condition that could affect her ability to carry out the responsibilities of the position for which she was hired. Yoder Decl. Ex. 4. Dr. Yoder noted that she had no condition that would restrict normal activities and was not using any medication that might affect her job performance. *Id.* He also listed her current medications, which on the version supplied to the Court are functionally illegible, except for the first, Wellbutrin, an antidepressant. *Id.*; *see*

10

*also* Yoder Decl. ¶ 8. Shull reviewed the Employee Health Examination Record and knows Wellbutrin is used to treat mental health conditions. Shull Dep. 50–51

Bocock discussed her assault with some of her coworkers at SYS. Bocock Dep. 94–96. While her civil suit against her assailant was pending, she showed them a disc containing pictures the police had taken of the assault, including of her face, the man's hand, and the bathroom where it occurred. *Id.* at 96–98; Shull Dep. Ex. 7. Shull was among those who saw the pictures. Bocock Dep. 95; Shull Dep. 62. Bocock's coworkers would joke about whether Bocock had taken her medication. Bocock Dep. 205. Shull knew that Bocock was taking medication for depression and anxiety, *id.* 132:10–11, and asked Bocock whether they were on the same medications, *id.* 205. Shull denied knowing what medications Bocock took, Shull Dep. 246:13–20, and Bocock admitted that she did not tell Shull the name of any of her medications, Bocock Dep. 132:4–7.

Bocock experienced two health issues during the spring of 2012. On April 20, 2012, she hit her right leg on a desk while breaking up a fight at SYS, requiring treatment for which she filed a workers' compensation claim. Bocock Decl. ¶ 5; *id.* Ex. 2. On May 5, 2012, Bocock experienced pain in her left chest, arm, and ribs and was admitted to the emergency department at Rockingham Memorial Hospital. Bocock Decl. ¶ 9; Yoder Decl. Ex. 5. The hospital records note that Bocock has a family history of heart disease and recently had been struck in her left upper arm at work. Yoder Decl. Ex. 5, 7. She was admitted for two nights for observation and testing. Bocock Decl. ¶ 9; Yoder Decl. Ex. 5–7. After a variety of tests ruled out a cardiac condition, she was discharged on May 7, 2012, with a diagnosis of chest wall and left arm pain

11

secondary to costochondritis[1] and physical trauma from the injury she suffered at work. Yoder Decl. Ex. 7. Shull approved sick leave for Bocock from May 7th to 9th, Bocock Decl. Ex. 3, 6, and the hospitalization bill cost SYS's health insurer over $11,000, *id.* Ex. 4.[2]

Bocock was also disciplined twice in the spring of 2012. On April 25, 2012, a student refused to listen to Bocock and cursed at her during physical education. Bocock Dep. 172:4–6; Shull Decl. Ex. 6. She disciplined him by verbally giving him "negative points." Bocock Dep. 172:6. The student saw Bocock filling out the points sheet—a means of recording a student's improper conduct—and complained to Shull, who told Bocock not to take points for the conduct. *Id.* 172:7–9. Bocock then went into the room where the student was and "ripped the paper up [to show] him it was over and done with." *Id.* 172:9–11. Sutton testified that Bocock then threw the paper pieces into the air, Sutton Dep. 61:23–62:9, and Shull claims to have found pieces of paper on the ground when she arrived in the classroom, Shull Dep. 274:25–275:4. Bocock, however, denies throwing or dropping the paper. Bocock Dep. 172:11–14, 173:10–17. Later that day, Bocock met with Shull, laid physical education paperwork on her desk and stated that she was done with it. Shull Decl. ¶ 4; Bocock Dep. 175:10–13. Bocock was required to attend supervised counseling for the incident, and she stated in counseling and in her deposition that she was wrong to tear up the points sheet in front of students. Shull Decl. Ex. 6; Bocock Dep. 172:21–22, 173:5–9. Bocock maintains that she was correct to take points from the student, Bocock Dep.

---

[1] Costochondritis is "an inflammation of the cartilage that connects a rib to the breastbone" which causes pain that "might mimic that of a heart attack or other heart conditions." *Costochondritis: Definition*, Mayo Clinic (March 20, 2015), http://www.mayoclinic.org/diseases -conditions/costochondritis/basics/definition/con-20024454.

[2] At her deposition, Shull testified that Bocock experienced chest pains at work and she and others convinced Bocock that she should go to the hospital. Shull Dep. 164–65. Bocock denies this event happened at work and claims that her pain occurred on Saturday, May 5th, as represented in her hospital admission form. Bocock Decl. ¶ 9; Yoder Decl. Ex. 5.

12

172:22–23, and Sutton agreed that it was standard practice to take points for cursing, Sutton Dep. 82–83.

On June 1, 2012, Bocock had supervised counseling at Jurentkuff's direction for an incident involving a school van. Shull Decl. Ex. 7. When students did not know what van they were supposed to be in for a trip, Bocock got out of the van she was to drive and waited until the students were situated before getting back in to drive. Bocock Dep. 175–177; Shull Decl. Ex. 7. Shull asserts that Bocock was "very agitated" and "walked off instead of working with staff as a team." Shull Decl. ¶ 5. Bocock denies this characterization and states that she was neither angry nor agitated during this exchange. Bocock Dep. 175:23; 229:1–9. In her counseling, Bocock wrote that she "was upset because the kids did not know what van [to get in and out of]" and after exiting her van she said "I will wait till everyone is in the van" before getting back in to drive. Shull Decl. Ex. 7.

Bocock received good evaluations throughout her time at SYS. *See* Shull Dep. Ex. 8 at 1 (rating Bocock as "Excellent" in all categories on August 2010), Ex. 8 at 2–6 ("Meets Standard" on June 9, 2010), Ex. 9 ("Meets Standard" on June 9, 2011); *see generally* Shull Dep. 70–73. The last evaluation in the record occurred on June 14, 2012, after the events described above; Bocock received "Meets Standard." *Id.* Ex. 10.

Bocock alleges that SYS engaged in a conspiracy and "discriminatory pattern of conduct," Bocock Br. in Opp'n 9, to either force her to quit or to justify her termination. On August 1, 2012, SYS offered Bocock her previous position of full-time technical and support teacher with the addition of one-on-one support staff duties for a specific student. Shull Decl. Ex. 10. Lessley, a one-on-one support staffer at this time, met in August 2012 with Shull and Shaun Waters, her immediate supervisor. Lessley Decl. ¶ 5. She was told that Bocock's demotion to

one-on-one support had eliminated Lessley's position. *Id.* After Lessley left distraught, she was called back, and Shull told her, "Don't worry, you won't be off work long. Susie is going to dig her own hole." *Id.* ¶ 6. Shull and Waters told Lessley not to discuss the matter with anyone else or to let on at staff meetings that she knew anything. *Id.* Waters caught up to Lessley as she left and said "Hey, don't worry about your job, J.K. is going to help with the process of getting rid of Susie. We've spoken with him."[3] *Id.* ¶ 7. J.K. was the student assigned to Bocock for one-on-one support. *Id.* The next day Shull encouraged Lessley not to look for a new job and shortly thereafter arranged for Lessley to work with a new student half the day and with J.K. while Bocock taught her electronics class. *Id.* ¶ 8. Lessley reports that at a staff meeting in August 2012, which Bocock did not attend, Shull stated that she thought "Susie's PTSD is affecting her performance with the kids." Lessley Decl. ¶ 11.

At a staff meeting in August, Shull instituted a new policy that one-on-one staffers were no longer allowed to let their students leave the classroom. Crawford Decl. ¶ 4. Some students had behavioral problems that caused them to wander and staffers were not allowed to physically restrain their students. *Id.* J.K. in particular was a difficult student prone to wandering the school. Lessley Decl. ¶ 10. Shirley Crawford was a one-on-one support staffer at this time. Crawford Decl. ¶ 2. Shortly after Shull announced the new policy, Crawford and other support staffers

---

[3] Lessley's declaration contains multiple statements from Waters, J.K., and Sutton discussing interactions with Bocock and Shull. *See* Lessley Decl. ¶¶ 5–7, 9, 12. These statements are all offered for the truth of the matters asserted, and SYS challenges them as hearsay. As a supervisor at Shenandoah Academy, Waters's statements, like Shull's, are party admissions under Rule 801(d)(2) of the Federal Rules of Evidence. Bocock argues that J.K. and Sutton's statements are also party admissions or, in the alternative, are admissible under Rules 803(1), (2), or (3). Bocock's Surreply 17–18. The Court is unable to determine the admissibility of J.K. and Sutton's statements from the information currently before it. Bocock does not elaborate upon which theory of party admission she alleges—such as co-conspirator or employee acting under official capacity—nor does she provide facts or argument in support of any theory of admissibility. Even so, the Court finds that J.K. and Sutton's statements are not necessary for the resolution of this motion and thus leaves the determination of their status for another day.

14

were expressing their displeasure and fear while on a smoke break; Bocock was not present. *Id.* ¶ 5. Waters approached the group and stated "I wouldn't worry about it. That's only for Susie." *Id.* ¶ 5.

When the school year began in August, Bocock's computer and desk were taken from her. Bocock Suppl. Decl. ¶ 3, ECF No. 46-19; Bocock Dep. 206–09. Shull claims that support staff, such as Bocock, were not assigned desks or computers, but rather had access to communal desks and computers that any support staffer could use. Shull Dep. 182–84, 194–96. Shull stated that she thought Bocock may have kept some of her things in the desk in Sutton's room, but that the desk was still open to the use of any support staffer. Shull Dep. 182:23–24. Sutton could not remember if the desk in her room was for Bocock as the one-on-one, or "just a staff desk that people used in my room," but she did state that the desk had to be removed because students were using it. Sutton Dep. 49:14–50:4. Bocock asserts that when she became the technical teacher she was given a desk and computer which she kept in the library. Bocock Suppl. Decl. ¶ 3. In August 2012, she was told to move her desk to Sutton's room, *id.*, and shortly thereafter Shull took away both her desk and computer, Bocock Dep. 207–09. Bocock maintains that she needed a desk and computer to do her job. *Id.* at 207:10–15, 208:15–25.

Bocock received two supervised counseling sessions at the start of the school year. A supervision note from August 10, 2012, states that Bocock met with Jurentkuff the day before to discuss her new job duties and starting the new year successfully. Shull Decl. Ex. 11. The note further states that Bocock had been disrespectful to lead staff and teachers in front of coworkers, coworkers were concerned about her attitude and the effects it could have on students, she needed to start the new year with a positive attitude and teamwork, and she should bring any issues to her supervisor privately. *Id.* Bocock asserts that she had a positive attitude already,

15

Bocock Dep. 185:10–12, and denies that she was disrespectful to any staff member, *id.* at 183:4–17. She objected at the time and only agreed to sign the supervision form because Shull assured her that it was a "counseling" and not a "write up." *Id.* at 183:18–24.

A supervision note from August 27, 2012, states that Bocock received counseling for three complaints: (1) J.K. was unhappy with Bocock's attitude, finding her demanding rather than suggestive; (2) a teacher, Ms. Ward, stated that Bocock disrupted class by answering academic questions meant for students; and (3) Sutton expressed discomfort over Bocock questioning her. Shull Decl. Ex. 12. Bocock contests all of these complaints. On the note itself, Bocock wrote: "Not true. I never heard J.K. say anything. I only asked her the day S.S. was fighting verbally [with] other students. Yes, I did answer questions but she was playing games."[4] *Id.* Shull says Bocock was loud and disrespectful at the supervision and refused to discuss the issues. Shull Aff. ¶ 10.

Sutton wrote a letter dated August 28, 2012, about an incident with Bocock. There is significant controversy between the parties about the letter's formation and the events described therein. In full, it reads:[5]

---

[4] In her brief, Bocock "disputes the context and substance of the August 27, 2012 write-up." The citations she provides, however, do not support her argument. *See* Bocock Br. in Opp'n ¶ 20. She disputes being disrespectful and loud, but cites in support passages of her deposition discussing the August 10 supervision note and the August 29 termination meeting. *Id.* She states that "Ms. Sutton simply wanted this issue to be addressed at a staff meeting, not that it shouldn't have been asked," but cites in support a part of Sutton's deposition discussing the August 28 letter, not Sutton's complaint in the August 27 note. Furthermore, the cited passages do not address raising issues at staff meetings or otherwise support Bocock's statement. *Id.* As such, the only evidence disputing the August 27 note is Bocock's handwritten objection on the note itself.

[5] Bocock's counsel objected to this letter as hearsay in her brief and at Sutton's deposition. Bocock Br. in Opp'n ¶ 21; Bocock Dep. 193:22. The letter is admissible for a number of reasons. First, both parties use it for purposes other than the truth of the matters asserted. Bocock uses inconsistencies between the letter, her termination note, and Farrell's declaration to allege that the entire encounter is fabricated. *See* Bocock Br. in Opp'n 12–15, 22–23, 29. SYS offers the letter for the impact it had upon Jurentkuff when he decided to fire Bocock. SYS Reply Br. in

16

> In the afternoon after school Suzie Bocock asked to speak to me. She came into my classroom and slammed her desk drawer and then slammed the outside door as she walked out. Ryan and Sarah Strauser were in the room when this happened. I was busy doing point[s] and filling out an incident report [so] I did not talk to her then. When I walked out of my classroom back door she was waiting outside. She confronted me about saying something to Ms. Shull. I felt very uncomfortable and intimidated by her. I answered her question by saying I did have a meeting with Ms. Shull. I then went to the meeting. I feel it is none of people['s] business when we meet with our boss.

Shull Decl. Ex. 13. After Sutton told Shull of this incident, Shull told her to write a statement. Shull Dep. 218:5–25.

Bocock denies that this event occurred. Bocock Dep. 193–95; 234:6–11; 235:5–14. She had a good relationship with Sutton and used to watch her kids when they were at the school and Sutton had meetings with Shull. *Id.* at 195:1–4. In her deposition, Sutton confirmed that she would leave her kids with Bocock at Shenandoah Academy and did not have any concerns with Bocock watching over them. Sutton Dep. 67:15–68:1. Describing the incident behind the letter, Sutton testified that Bocock said she needed to talk to her, but was not demanding. *Id.* at 98:8–13. She walked out of her classroom's back door on her way to see Ryan Farrell and found Bocock outside. *Id.* at 100. She was startled, *id.* at 99:2–5, and a little uncomfortable because she does not like confrontation, *id.* at 98:13–24, 100:11. She does not remember exactly what she said, but states that she "might have answered her questions" and "probably . . . answered them and walked away." *Id.* at 100:3–9. She did not feel threatened or intimidated, *id.* at 90:9–14, and specifically denied feeling physically threatened by Bocock then or generally, *id.* at 100:12–15, 102:11–12. Sutton told Shull about the incident, and Shull had her write a report of it. *Id.* at 102.

---

Supp. 10; Jurentkuff Decl. ¶ 14, 16, 18; Shull Decl. Ex. 14; Fed. R. Evid. 803(3). The letter is admissible to provide context for Jurentkuff's termination decision, and, regardless of the truth of the events recounted, provides a link in both parties' timeline of events. Moreover, Sutton testified at her deposition about the event, and that account is certainly admissible for this motion.

17

The "Ryan" mentioned in Shull's letter refers to Ryan Farrell; he was the only Ryan on staff at the time. Shull Dep. Ex. 11. In his declaration, Farrell states that he "did not observe Ms. Bocock slamming a door or a desk drawer in Christa Sutton's room." Farrell Decl. ¶ 5. He also recalls that Bocock entered his classroom after she was fired and asked him to do something, but he was afraid to say anything to Shull because he was dependent upon her for a good evaluation and feared retaliation. *Id.* ¶ 6.

On August 29, 2012, Shull told Jurentkuff that she had concerns about Bocock's conduct and "unwillingness to communicate or accept supervision." Jurentkuff Decl. ¶ 14. Later that day Bocock had a meeting with Jurentkuff and Shull that ended with Jurentkuff terminating her. *See* Shull Decl. Ex. 14; Bocock Dep. 196–98; Shull Dep. 241–54. Jurentkuff and Shull told Bocock that they had a letter stating that she had threatened a teacher and put that teacher in a corner. Bocock Dep. 196:23–24, 197:10–12, 198:14–15. When Bocock asked to see the letter, they refused. *Id.* at 197:1–2. Jurentkuff and Shull said that they felt she would be threatening to other staff and the students. *Id.* at 196:24–197:1. Shull testified that Bocock refused to discuss her performance issues, put her hand up to Jurentkuff's face, and walked out of the meeting. Shull Decl. ¶ 12; Shull Dep. 241–42. Bocock denies ever putting her hand in Jurentkuff's face, Bocock Decl. ¶ 3, and Jurentkuff does not mention such a gesture in his declaration.

Jurentkuff wrote a counseling note after the termination meeting. Shull Decl. Ex. 14. It states that Bocock was terminated for "intimidation of staff, disrespect to supervisors," and one staff's report of feeling "physically threatened" by her behavior, citing to the employee code of conduct prohibiting threatening other staff. *Id.* Jurentkuff wrote that "there is significant concern [about] student safety if Ms. Bocock got upset with them" and referenced the April 25, 2012, incident when Bocock tore up the points sheet. *Id.* He mentioned that he had previously

18

addressed these issues with Bocock on August 10, 2012, and concluded that termination was necessary to "preserve safety of staff [and] students." *Id.*

Jurentkuff stated that Shull did not advocate for Bocock's termination. Jurentkuff Decl. ¶ 17. Additionally, he did not know that Bocock had a mental impairment or was taking any medications. *Id.* ¶¶ 20–21.

Bocock filed her Charge of Discrimination with the EEOC on June 6, 2013, Compl. Ex. 1, and the EEOC issued its Notice of Right to Sue on July 31, 2014, *id.* Ex. 2.

### III. Discussion

A.    *Standard of Review*

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Tolan v. Cotton*, --- U.S. ---, 134 S. Ct. 1861, 1866 (2014) (per curiam). Facts are material when they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute over a material fact exists if "a reasonable jury could return a verdict in favor of the nonmoving party." *Kolon Indus., Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 173 (4th Cir. 2014) (citing *Anderson*, 477 U.S. at 248).

"The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Appalachian Power Co. v. Arthur*, --- F. Supp. 2d ---, 2014 WL 3900618, at *6 (W.D. Va. 2014) (Urbanski, J.) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party makes that showing, the nonmoving party must then produce admissible evidence—not mere allegations or denials—establishing the specific material facts genuinely in dispute. Fed. R. Civ. P. 56(c), (e); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wilkins v. Montgomery*, 751 F.3d 214, 220 (4th Cir. 2014). When deciding a summary judgment motion,

the court must consider the whole record and draw all reasonable inferences in the light most favorable to the nonmoving party. *Tolan*, --- U.S. ---, 134 S. Ct. at 1866. The court does not weigh evidence, consider credibility, or resolve disputed issues—it decides only whether the record reveals a genuine dispute over material facts. *See id.*

B.    *Analysis*

The ADA makes it unlawful for a covered employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a). A plaintiff may prove disability discrimination through direct evidence or indirectly through the burden-shifting framework set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015); *see Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 57–58 (4th Cir. 1995) (extending the *McDonnell Douglas* burden-shifting approach to ADA cases). Under this framework, the plaintiff must first establish a prima facie case of discrimination. *Ennis*, 53 F.3d 58. If the plaintiff satisfies each element of the claim, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the employer produces such evidence, the burden returns to the plaintiff to demonstrate that the employer's asserted justification is a pretext for discrimination. *Id.*

1.    *Bocock's prima facie case*

To make a prima facie case of wrongful termination under the ADA, an employee must demonstrate: (1) she was a qualified individual with a disability; (2) she was fulfilling her employer's legitimate expectations; (3) she was discharged; and (4) the circumstances of her discharge raise a reasonable inference of unlawful discrimination. *See Reynolds v. Am. Nat'l Red*

*Cross*, 701 F.3d 143, 150 (4th Cir. 2012); *Chamberlain v. Valley Health System, Inc.*, 781 F. Supp. 2d 305, 310 (W.D. Va. 2001). SYS does not challenge the first three elements. The evidence establishes that Bocock has a disability under either an "actual disability" or "record of" analysis.[6] *See* Bocock Dep. 42:5–7 (diagnosis of PTSD); Yoder Decl. ¶¶ 2–4 & Ex. 1–3 (treatment notes chronicling depression and anxiety). She was fulfilling SYS's legitimate expectations, achieving at least "Meets Standard" on every evaluation received. Shull Dep. Exs. 8–10; *see Jones v. Calvert Group, Ltd.*, No. 06-2892, 2010 WL 5055790, at *6 (D. Md. Dec. 3, 2010) (citing *King v. Rumsfeld*, 328 F.3d 145, 149–50 (4th Cir.), *cert. denied*, 540 U.S. 1073 (2003)) (finding that an employee may show she met her employer's expectations with "evidence that the employer had previously given the employee positive performance reviews"). Similarly, it is undisputed that Bocock was terminated. *See* Shull Decl. Ex. 14; Shull Dep. 241–54; Bocock Dep. 196–98.

SYS's motion hinges on the final element, arguing that the evidence does not support a reasonable inference of unlawful discrimination. To satisfy this element, Bocock must demonstrate that her disability was a "motivating factor" for her termination. *See Baird v. Rose*, 192 F.3d 462, 470 (4th Cir. 1999); *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 600 (D. Md. 2013) (citing *Baird*, 192 F.3d at 470)). Viewing the facts in the light most favorable to Bocock, she has put forth evidence from which a reasonable jury could conclude that SYS was aware of Bocock's disability and that it was a motivating factor in her termination.

---

[6] A "disability" under the ADA may take any of three forms: "(1) a physical or mental impairment that substantially limits one or more major life activities (the 'actual disability' prong); (2) a record of such an impairment (the 'record of' prong); or (3) being regarded as having such an impairment (the 'regarded as' prong)." *Summers v. Altarum Institute Corp.*, 740 F.3d 325, 328 (4th Cir. 2014) (quoting 42 U.S.C. § 12102(1)) (internal quotation marks omitted).

It was common knowledge at SYS that Bocock had some sort of mental condition for which she took medication. Bocock's coworkers joked about whether Bocock had taken her medication. Bocock Dep. 205. Shull knew that Bocock was taking medication for depression and anxiety, *id.* 132:10–11, and asked whether she and Bocock took the same medications, *id.* 205.[7]

---

[7] As additional support for Shull's knowledge that Bocock had depression and anxiety, Bocock cites a passage from Shull's deposition concerning Bocock's Employment Health Report, which listed Wellbutrin as a current medication:

> Q: There are various medications that are listed on the second page of this document. Did those cause you any concern?
> A: I can't—I don't know them.
> Q: Wellbutrin?
> A: Where are you seeing that?
> Q: Says "Medications using."
> A: Yeah, I see that. But where do you see that? I can't read it.
> Q: The first one is Wellbutrin.
>     MR. THORSEN: Well, that's your representation. But go ahead.
>     BY MR. CUPP:
> Q: Do you know what Wellbutrin is for?
> A: It can be for a lot of things.
> Q: Okay. What do you understand it to be for?
> A: It can change the color of your hair. It can be—
>     MR. THORSEN: Dark to—from light to dark?
>     THE DEPONENT: Yeah, it can.
> A: It can be for OCD. It can be for depression. It can be—I don't know. Doctors give it for all kinds of things, when I think about the med books of my students.

Shull Dep. 50:10–51:10. From this exchange, a jury could infer that Shull knew Bocock took Wellbutrin and that the medication was commonly used to treat mental impairments, such as depression.

Bocock argues that other evidence shows that Shull knew of her disability, namely that Shull saw pictures of Bocock after her assault and knew that she was hospitalized for a leg injury and chest pains. Bocock Br. in Opp'n 20. The Court is not convinced by these arguments. Evidence of a physical assault does not convey knowledge of a resulting mental condition. Likewise, Bocock's hospitalizations were both for physical ailments unconnected to Bocock's anxiety, depression, or PTSD. *See* Yoder Decl. Exs. 5–7. In her brief and at oral argument, Bocock's counsel implied that her chest pains were related to increased anxiety, *see* Bocock Br. in Opp'n 8, but the medical records do not support that conclusion and instead assess a purely physical diagnosis related to a recent arm injury, *see* Yoder Decl. Ex. 7.

22

At a staff meeting without Bocock present, Shull stated that she thought "Susie's PTSD is affecting her performance with the kids." According to Lessley, Shull announced her concerns about Bocock's PTSD in August 2012, the same month that Bocock was terminated. Lessley Decl. ¶ 11. "Such close temporal proximity weighs heavily in favor of finding a genuine dispute as to causation." *Jacobs*, 780 F.3d at 575.

Directly contradicting this evidence, Shull has denied that she knew Bocock had a mental impairment. Shull Decl. ¶¶ 14–16; Shull Dep. 255:22–25, 270:7–15. Of course, in evaluating SYS's summary judgment motion, the Court cannot credit Shull's denial and find a lack of knowledge. On the other hand, when a supervisor or employer denies knowing that an employee has a disability, and that denial is shown to be false, a court may infer a discriminatory motive. *See Croy v. Blue Ridge Bread, Inc.*, No. 3:12cv34, 2013 WL 3776802, at *5 (W.D. Va. July 15, 2013) (finding an employer's "insist[ance] that it was unaware of [Croy's] illness until after the termination, in spite of considerable evidence to the contrary," allowed an inference of discriminatory purpose). Thus, at this stage Shull's denial in the face of contrary evidence bolsters Bocock's prima facie case.

Bocock also provides evidence that SYS, through Shull and Waters, engaged in a "discriminatory pattern of conduct" against her. Bocock Br. in Opp'n 9. They referred to Bocock's assignment to one-on-one support staff duties as a demotion in a conversation with Lessley. Lessley Decl. ¶ 5. Waters told Lessley that they were in "the process of getting rid of [Bocock]" and that Bocock was "going to dig her own hole," and he implied that Lessley could soon take over Bocock's one-on-one support duties. *Id.* ¶¶ 6–7. SYS issued a new, difficult rule for one-on-one support staff, then Waters told other staff that the rule only applied to Bocock. Crawford Decl. ¶¶ 4–5. When the school year began, SYS took away Bocock's computer and

desk—two things Bocock says she needed to perform her job. Bocock Suppl. Decl. ¶ 3; Bocock Dep. 206–09.

A potential weakness in Bocock's prima facie case is that Jurentkuff rather than Shull made the decision to fire Bocock and there is significantly less evidence that he knew of Bocock's disability. Nonetheless, "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). Jurentkuff did not have personal knowledge of the events occurring at Shenandoah Academy; he relied upon Shull to pass him information before his meeting with Bocock that ended in her termination. Jurentkuff Decl. ¶ 14 ("Ms. Shull advised me of the aforementioned conduct of Ms. Bocock and Ms. Bocock's unwillingness to communicate or accept supervision."). Jurentkuff largely relied upon the incidents recorded and relayed to him by Shull in deciding to terminate Bocock. *See* Shull Decl. Ex. 14; Jurentkuff Decl. ¶¶ 14, 16, 18. Under these circumstances, the Court may impute any discriminatory animus held by Shull to Jurentkuff. *See Staub*, 562 U.S. at 422 (imputing the discriminatory animus of two supervisors who put an unfavorable entry into Staub's personnel file to the decision-maker who relied upon the file).

Finally, the justifications SYS put forward for its termination decision can relate to mental instability: disrespect to staff and supervisors, intimidation and threatening of staff, and concern over student and staff safety. *See* Shull Dep. Ex. 14. Bocock's testimony and other evidence suggest that SYS exaggerated and fabricated the disciplinary incidents underlying these

24

justifications in order to paint her as angry and volatile.[8] The ADA prohibits employers from relying upon such unfounded accusations of threat, intimidation, and fear for safety. *See Quiles-Quiles v. Henderson*, 439 F.3d 1, 6 (1st Cir. 2006) ("The belief that the mentally ill are disproportionately dangerous is precisely the type of discriminatory myth that the Rehabilitation Act and ADA were intended to confront."); Jurentkuff Decl. ¶ 16 (relating that he terminated Bocock "for the safety of staff and students" because he believed "she had difficulty controlling her anger"). The reasons SYS themselves gave for Bocock's termination thus imply that her disability was a motivating factor in her termination and raise a reasonable inference of unlawful discrimination.

### 2. *SYS's Non-Discriminatory Reasons for Termination*

SYS presents a series of disciplinary incidents that it argues provides a legitimate, non-discriminatory basis for Bocock's termination. *See generally*, SYS Reply Br. in Supp. 14–15. These are: (1) in April 2012, Bocock tore up a points sheet in front of a student, Shull Decl. Ex. 6; (2) Bocock laid physical education paperwork on Shull's desk and said she was done with it, *id.* ¶ 4; (3) in June, Bocock exited a school van agitated and refused to work with coworkers, *id.* ¶ 5, Ex. 7; (4) in early August, Bocock was loudly disrespectful to lead staff and a teacher in front of her coworkers, *id.* Ex. 11; (5) on August 27, she had counseling complaints from a student about her being demanding, a teacher about her answering questions, and Sutton about Bocock questioning her, *id.* Ex. 12; and (6) on August 28, Sutton wrote a letter asserting that Bocock questioned her in a way that made her uncomfortable and intimidated, *id.* ex. 13.

---

[8] The Court recognizes that SYS's termination justifications are discriminatory only if they are unfounded and the events they are based upon did not occur as SYS argues. I conclude in Part III.B.3 that, accepting her evidence as I must at this stage, Bocock has at least created a dispute over whether some of the incidents relied upon by SYS occurred.

Jurentkuff met with Bocock on August 29 and claims that he fired her after she refused to accept or discuss this series of incidents. Jurentkuff Decl. ¶¶ 15–16.

Though Bocock disputes these events, SYS's burden at this step "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 142 (2000). A series of documented disciplinary actions such as those SYS has provided is sufficient to satisfy its "relatively modest burden" under this step. *Jacobs*, 780 F.3d at 575*; see also Morris v. Sheetz, Inc.*, No. 5:13cv95, 2015 WL 1925457, at *8 (W.D. Va. Apr. 28, 2015) (finding employer had a legitimate reason for terminating employee after multiple documented performance issues and disciplinary actions).

### 3.     Pretext

The burden now shifts back to Bocock to establish a genuine question of whether SYS's asserted justifications are pretextual. *See Ennis*, 53 F.3d at 58. One of the ways Bocock can meet this burden is by demonstrating that SYS has offered false or inconsistent justifications for her termination. *Croy*, 2013 WL 3776802, at *5 (citing *Reeves*, 530 U.S. at 147 and *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002)).

Bocock largely admits the conduct described in the spring incidents, though she disputes some portions of the events described by SYS. Bocock admits she met with Shull, laid physical education paperwork on her desk, and stated that she was done with it. Shull Decl. ¶ 4; Bocock Dep. 175:10–13. She also ripped up the points sheet in front of students, Bocock Dep. 172:9–11, but did not throw the pieces in the air or drop them on the ground as Sutton testified, *id.* 172:11–14, 173:10–17; Sutton Dep. 61:23–62:9. Concerning the van incident, Bocock testified that she

was not angry or agitated during the exchange and that she did not refuse to cooperate with her coworkers after exiting the van.[9] Bocock Dep. 175:23; 229:1–9.

In contrast, Bocock heavily disputes SYS's version of the fall incidents. She denies being disrespectful to any staff member in early August, Bocock Dep. 183:4–17, and only agreed to sign the supervision form because Shull had assured her that it was a "counseling" and not a "write up," *id.* at 183:18–24. Bocock wrote her objections to the August 27 counseling on the supervision note: "Not true. I never heard J.K. say anything. I only asked her the day S.S. was fighting verbally [with] other students. Yes, I did answer questions but she was playing games." Shull Decl. Ex. 12.

Importantly, Bocock denies the events related in Sutton's letter entirely.[10] Bocock Dep. 193–95; 234:6–11; 235 5–14. Ryan Farrell, who Sutton's letter states was in the room during the altercation, testified that he "did not observe Ms. Bocock slamming a door or a desk drawer in Christa Sutton's room." Farrell Decl. ¶ 5. By SYS's own evidence, Sutton's letter was a primary justification for Bocock's termination. The letter formed the basis of the allegations of intimidation and threatening of staff and the corresponding violation of the code of conduct

---

[9] Though Bocock's version of these incidents is substantially similar to that related by SYS, the evidence demonstrates that SYS did not consider Bocock's behavior in the spring to be grounds for termination. SYS gave Bocock a "Meets Standards" evaluation on June 14, Shull Dep. Ex. 10, and rehired her for the following year, Shull Decl. Ex. 10. For Bocock's termination, SYS largely relied upon the fall disciplinary actions as support, though Jurentkuff did reference the points sheet incident in the termination paperwork. *Id.* Ex. 14.

[10] SYS at first contended that the incident described in Sutton's letter occurred on August 27th, directly following Bocock's counseling meeting with Shull. Shull Decl. ¶ 11; SYS Br. in Supp. 5. In its reply brief, SYS acknowledged that Sutton testified that the event occurred on August 28, the date written on the letter, Sutton Dep. 100:25–101:101:4, 102:15–25, and changed its position accordingly. Bocock argues that this is further evidence the event was fabricated, as SYS originally presented the August 27 counseling as the impetus behind Bocock's alleged confrontation with Sutton and did not provide an alternative motivation once they acknowledged the different date. *See* Bocock Br. in Opp'n 23; Bocock Surreply 18–19.

regarding "Threatening other staff" cited in the termination paperwork.[11] Shull Decl. Ex. 14. Sutton's letter appears to be an integral part of Jurentkuff's decision to terminate Bocock. *See* Jurentkuff Decl. ¶ 16 ("The letter we had received from Ms. Sutton clearly stated she felt intimidated. This combined with past behaviors . . . indicated to me that she had difficulty controlling her anger, so for the safety of staff and students, I terminated Ms. Bocock's employment on behalf of SYS."). Sutton recanted some of the things she wrote in the letter, and other evidence, such as Ferrell denying he was present, raise questions about this central justification for Bocock's termination. Additionally, Shull told Sutton to write the letter, and Shull requested that Jurentkuff hold the termination meeting.

The parties furthermore dispute what occurred during Bocock's termination meeting. Shull states that Bocock refused to discuss her performance issues, put her hand up to Jurentkuff's face, and walked out of the meeting. Shull Decl. ¶ 12; Shull Dep. 241–42. Jurentkuff testified that Bocock refused to accept or discuss his concerns about her behavior. Jurentkuff Decl. ¶ 16. Bocock states that Jurentkuff and Shull told her they had a letter saying she threatened a teacher and put the teacher in a corner, refused to show her the letter, did not accept her explanation, and proceeded to fire her. Bocock Dep. 196:23–24, 197:1–12, 198:2–6, 14–15; Bocock Decl. ¶ 3. Viewing the facts in Bocock's favor, as I must, the evidence suggests that SYS exaggerated or fabricated disciplinary events to establish a basis for Bocock's termination.

---

[11] Bocock's termination note states that a staff member felt "physically threatened." At the August 29 meeting, Jurentkuff and Shull said they had a letter that stated Bocock had threatened a teacher. Bocock Dep. 196:23–24, 197:1012, 198:14–15. Bocock drew the inference that Sutton was the staff member who allegedly felt physically threatened. *Id.* 196:23–197:6, 234:1–11. Sutton, however, testified that she never felt physically threatened by Bocock. Sutton Dep. 100:12–15, 102:11–12. Shull and Jurentkuff have not identified another staff member to account for this statement. *See* Shull Dep. 252:6–17, 253:1–23. This inability to link a physical threat to any staff member raises questions about one of the grounds for Bocock's termination.

Bocock has provided admissible evidence, through herself and others, that Shull knew of her disability, Shull's safety concerns were founded on Bocock's disability, Shull and Waters engaged in a pattern of discriminatory conduct towards Bocock, Shull initiated the termination meeting, and Shull and Jurentkuff embellished or invented incidents to justify Bocock's termination. "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148.

## IV. Conclusion

For the foregoing reasons, I find that a genuine issue of material fact exists as to whether Bocock was terminated in violation of the ADA. Therefore, I **RECOMMEND** the presiding District Judge **DENY** SYS's Motion for Summary Judgment, ECF No. 35. For the reasons stated in Part I of this report and recommendation, I will **DENY** Plaintiff's Renewed Motion to Strike New Matter Raised in Reply, Including Declaration of Stephen Jurentkuff, ECF No. 44, and Defendants' Motion to Strike the Declaration of Tabatha Lessley, ECF No. 48. A separate order will enter as to the motions to strike.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Case 5:14-cv-00050-EKD-JCH   Document 66   Filed 10/23/15   Page 29 of 30   Pageid#: 1475

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Elizabeth K. Dillon, United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record and unrepresented parties.

ENTER: October 23, 2015

Joel C. Hoppe
United States Magistrate Judge